**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

DAVID MAHLER                                      CIVIL ACTION

VERSUS                                            NO. 05-0378

WARDEN BARON KAYLO                                SECTION "I"(5)

<u>REPORT AND RECOMMENDATION</u>

This matter was referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. §636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases. Upon review of the entire record, the court has determined that this matter can be disposed of without an evidentiary hearing. <u>See</u> 28 U.S.C. §2254(e)(2). Accordingly, it is recommended that the petition be **DENIED WITH PREJUDICE.**

<u>PROCEDURAL HISTORY</u>

On August 31, 1997, petitioner, David Mahler, was indicted on the charge of second-degree murder.[1] On April 22, 1998, following

---

[1]Copies of the indictment are contained in the State rec., vols. 2 and 9 of 10.

1

trial by jury, petitioner was found guilty on the lesser charge of manslaughter.[2]  On October 13, 1998, petitioner was sentenced to 20 years incarceration with credit for time served.[3]

Pursuant to his appeal, on February 7, 2001, the Louisiana Fourth Circuit Court of Appeal affirmed petitioner's manslaughter conviction and 20-year sentence.  State v. Mahler, No. 99-KA-0417 (La. App. 4 Cir. 2001) (unpublished opinion).[4]  Approximately one year later, on February 22, 2002, the Louisiana Supreme Court denied petitioner's writ application.  State v. Mahler, 809 So.2d 981 (La. 2002).

On or about February 10, 2003, petitioner filed an application for post-conviction relief with the state district court.[5]  The district judge, the Honorable Dennis Waldron, conducted two evidentiary hearings in connection with petitioner's application for post-conviction relief, one on March 12, 2004, and a second on April 20, 2004.  Following the April 20, 2004 hearing, Judge Waldron, setting forth his reasoning on the record, denied

---

[2]See State rec., vol. 9 of 10, docket master, p. 2.

[3]See State rec., vol. 9 of 10, docket master, p. 3.

[4]A copy of the Louisiana Fourth Circuit's unpublished decision is contained in the State rec., vol. 1 of 10.

[5]A copy of petitioner's original post-conviction application, along with supplements thereto, are contained in the State rec., vol. 8 of 10.

petitioner post-conviction relief.[6]   On September 10, 2005, the Louisiana Fourth Circuit Court of Appeal, finding "no error in the trial court's denial for post-conviction relief", denied petitioner's writ application.  State v. Mahler, No. 2004-K-1018 (La. App. 4 Cir. 2004) (unpublished opinion).[7]   Finally, on February 4, 2005, petitioner's state post-conviction proceedings came to an end when the Louisiana Supreme Court, without setting forth supporting reasons, denied his writ application.  State v. Mahler, 893 So.2d 85 (La. 2005).

In the instant federal habeas corpus action, petitioner raises the following claims: 1) He was denied effective assistance of counsel; 2) the State failed to provide the defense with exculpatory evidence; 3) the evidence submitted was insufficient to support petitioner's conviction; 4) the trial court's denial of defense counsel's request that the jury view the crime scene constituted a violation of petitioner's constitutional rights; 5) petitioner's 20-year sentence is unconstitutionally excessive; 6) petitioner's conviction is unconstitutional due to the fact that the system employed to choose the foreperson of the grand jury which indicted petitioner systematically excluded African-

_____

[6]Copies of the transcripts of both the March 12th and April 20th, 2004 evidentiary hearings are contained in the State rec., vol. 8 of 10.

[7]A copy of the state appellate court's unpublished decision is contained in the State rec., vol. 1 of 10.

Americans; 7) petitioner's conviction is violative of the Louisiana Constitution due to the fact that the statutes in effect at the time that prescribed the method of selecting grand juries in Orleans Parish were unconstitutional local laws violative of Article III, Section 12 of the Louisiana Constitution; and, 8) petitioner's conviction is unconstitutional due to the State's use of the "short form indictment". The State does not contest, and this court's review has confirmed, the timeliness of the instant action. Further, review of petitioner's state court filings reveals that petitioner raised all of the claims set forth in the instant action in his state direct appeal and/or post-conviction proceedings, both of which were pursued to the state's highest court. Accordingly, petitioner has exhausted his state court remedies as required under Rose v. Lundy, 455 U.S. 509, 102 S. Ct. 1198, 71 L. Ed. 2d 379 (1982). Before proceeding to the merits, the court shall set forth a summary of the facts obtained from the state appellate court's unpublished opinion, State v. Mahler, No. 99-KA-0417 (La. App. 4 Cir. 2001).[8]

---

[8]In its opinion, a copy of which is contained in the State rec., vol. 1 of 10, the Louisiana Fourth Circuit Court of Appeal sets forth a lengthy factual recitation, much of which consists of essentially the same version of events provided by the numerous witnesses to the shooting. Rather than reiterating this repetitive testimony, the court has summarized it, setting forth two versions of events, one perceived by the victim's friends and the other perceived by petitioner and his family. Also included in the court's summary is testimony from police investigators and medical personnel.

**FACTS**

On August 30, 1997, Craig Zimmer attended the Venetian Isles Fishing Rodeo.  At about midnight, a fistfight broke out and Zimmer was punched by Nicholas Mahler.  Later that same night, Zimmer and several of his friends went to the Mahler camp where they were met not only by Nicholas Mahler, but also his father, Christopher Mahler, and his uncle, David Mahler.   Shortly thereafter, Christopher Mahler armed himself with a shotgun while David Mahler retrieved a .25 caliber pistol from the trunk of his car.  David Mahler ultimately shot Craig Zimmer in the back.

New Orleans Police Detective Daniel Wharton, the lead investigator in the shooting death of Craig Zimmer, testified that when he arrived at the scene, the victim had already been removed. The detective learned that the victim's father, Craig Zimmer, Sr., along with friends of the victim, had left the location in the victim's truck, following the emergency unit transporting the victim to the hospital.   Wharton's partner, Detective Beverly Gunter, arrived on the scene before he did and, through speaking with the witnesses, she discerned that there were two groups involved in the shooting: Mahler family members and the victim and his friends.  In addition to collecting evidence and directing photography of the scene, Detective Wharton interviewed twelve witnesses.  He identified pictures of the scene, the bullet retrieved during the victim's autopsy, the victim's shirt

evidencing a bullet hole in the left back area, as well as the .25 caliber weapon which fired the fatal shot and the shotgun confiscated from Christopher Mahler. Wharton stated that the first call reporting the shooting came in at 12:39 a.m., August 31, 1997, followed by approximately three others.

Officer Kenneth Leary, a New Orleans Police Department firearms expert, testified that he test fired the 20-gauge shotgun confiscated from Christopher Mahler and determined that the weapon was functional. He also test fired the .25 caliber semi-automatic Berretta pistol seized from the defendant the night of the shooting, and compared the test bullet to the bullet retrieved from the victim's body during the autopsy. Testing conclusively proved that the Berretta fired the bullet removed from the victim's body.

Dr. Richard Tracey, the forensic pathologist who performed the autopsy, testified that the victim suffered a single, back to front gunshot wound.  The bullet entered just below the left shoulder blade and lodged beneath the skin just to the right of the midline in the chest.  The bullet's trajectory entered the victim's left lung, severed the aorta and pierced the heart.

Several of the victim's friends gave testimony to the effect that upon arriving at the Mahler camp, they came into contact with Nicholas Mahler, his father, Christopher Mahler, and his uncle, David Mahler.  Words were exchanged, Nicholas Mahler punched T. J. Willis, a friend of the victim's, in the back of his head, then ran

behind his father, Christopher Mahler, who was armed with a shotgun.  At that point, with Christopher Mahler's shotgun pointed at Willis, the victim entered the fray, pushing the gun away from Willis.  As the victim turned away, the defendant stepped forward, and shot him in the back.

In contrast, Christopher Mahler testified that after his son, Nicholas, hit Willis, the victim approached him and attempted to "wrest control of the shotgun from him."  It was during this struggle for the shotgun that, according to Christopher Mahler, his brother, David, shot the victim.  David Mahler's testimony corroborated his brother's version of events.  According to David Mahler, he fired his gun in the direction where the struggle for control over the shotgun was taking place and thereafter, saw the victim on the ground.

**<u>ANALYSIS</u>**

**Claim 1):  Ineffective Assistance of Counsel**

To prove that counsel was unconstitutionally ineffective, petitioner must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense.  If a court finds that petitioner has made an insufficient showing as to either one of the two prongs of inquiry, it may dispose of the claim without addressing the other prong.  <u>Strickland v. Washington</u>, 466 U.S. 668, 697, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674 (1984).

Under the deficient performance prong of the <u>Strickland</u> test,

"... it is necessary to 'judge...counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" Lockhart v. Fretwell, 506 U.S. 364, 371, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993), quoting Strickland, 466 U.S. at 690, 104 S.Ct. at 2066. "'An attorney's performance, which enjoys a strong presumption of adequacy, is deficient if it is objectively unreasonable.'" United States v. Walker, 68 F.3d 931, 934 (5th Cir. 1995), cert. denied, 516 U.S. 1165, 116 S.Ct. 1056, 134 L.Ed.2d 201 (1996), quoting United States v. Acklen, 47 F.3d 739, 742 (5th Cir. 1995), cert. denied, 519 U.S. 1142, 117 S.Ct. 1017, 136 L.Ed.2d 893 (1997).

To prove prejudice under the Strickland standard, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S.Ct. at 2068. The Strickland court defined a reasonable probability as a "probability sufficient to undermine confidence in the outcome." Id.

Petitioner contends that counsel was ineffective in failing to object when the prosecutor, along with prosecution witnesses, referred to the pertinent shooting incident as "the murder" and referred to petitioner as "the murderer". This court's review of the trial transcript uncovered six instances where this occurred without objection from defense counsel.

The first instance occurred in connection with the prosecution's re-direct examination of New Orleans Police Detective Daniel Wharton. The following exchange took place without objection.

> Q. You were not there when David Mahler murder[ed] Craig Zimmer, were you?
> A. No, I wasn't.[9]

The next time was during the prosecution's direct examination of Chad Nichols, a friend of the victim's.

> Q. Were you there the night [the victim] was murdered?
> A. Yes, sir.[10]

Thereafter, the prosecution's questioning of a second friend, T.J. Willis, elicited the following exchanges:

> Q. And in State's Exhibit 2, would you identify the contents of State's Exhibit 2.
> A. That's Craig's under shirt, his t-shirt that he was wearing.
> Q. And why is it lying there in that condition?
> A. Because he was shot and murdered in the back.[11]
>
> Q. T.J., how does this make you feel?
> A. Not very good.
> Q. And why is that?
> A. Murdered my best friend.[12]

The final two instances occurred during the prosecution's examination of Mark Schurr, another friend of the victim's. In questioning Schurr with respect to the events which occurred directly after the shooting,

---

[9] See State rec., vol. 4 of 10, p. 50, lines 1-4.

[10] See State rec., vol. 4 of 10, p. 90, lines 30-31.

[11] See State rec., vol. 4 of 10, p. 140, lines 15-19.

[12] See State rec., vol. 4 of 10, p. 147, lines 30-32, and p. 148, line 1.

the prosecution elicited testimony to the effect that the petitioner agreed to perform CPR on the victim only after petitioner realized "he had murdered [Schurr's] friend...."[13]   Then, in connection with his re-direct examination of Schurr, the prosecution asked:  "When did the murder happen?"[14]

Shortly thereafter, during the direct examination of Jason Martin, another one of the victim's friends, the prosecutor asked: "Were you with [the victim] on the day he was murdered?"[15]  It was at this point, based upon the fact that the prosecutor had commenced to routinely refer to the incident as a murder, that defense counsel raised an objection which the trial court sustained.[16]

The infrequency of the instances during trial when the incident was improperly characterized as a murder or petitioner was improperly characterized as a murderer, in and of itself, would support a finding that petitioner suffered no prejudice.  However, further ensuring that petitioner was not prejudiced was the trial court's explanation, after sustaining defense counsel's objection, that the issue of whether or not a murder occurred was "ultimately for the [j]ury to decide."[17]

---

[13]See State rec., vol. 4 of 10, p. 262, lines 7-8.

[14]See State rec., vol. 5 of 10, p. 289, line 25.

[15]See State rec., vol. 5 of 10, p. 293, line 27.

[16]See State rec., vol. 5 of 10, p. 293, lines 30-32, and p. 294, lines 1-8.

[17]See State rec., vol. 5 of 10, p. 294, lines 9-10.

10

Lastly, there is no reason to believe the jury was adversely influenced by these remarks. Mahler was ultimately found guilty of manslaughter, not murder, indicating that the jury heeded the curative instruction provided by the trial judge. Accordingly, petitioner's ineffectiveness claim based upon defense counsel's failure to object to the above-enumerated instances wherein the pertinent incident was improperly referred to as a murder or petitioner was referred to as a murderer, is without merit.

Defense counsel, according to petitioner, was also ineffective due to his failure to object to the following closing remarks made by the prosecutor which, according to petitioner, "appealed to the passion and sympathies of the jury and had nothing whatsoever to do with guilt or innocence."[18]

> Well, on that night the Zimmers, sitting right here in front of ya'll, they were awake, but they got that – not that phone call, but Jimmy Amato and Jack Nicholls came and got them, right across the Chef Pass. And they got that sinking feeling, "Something's happened, Mr. Craig. Little Craigie has been shot, something happened, he's been shot." Imagine that feeling that went through them at that time, the not knowing, the sinking feeling of, Oh, my God, my child has been harmed, my child has gotten into an accident, my child has been shot. That's the same feeling those two people went through, that entire family, that night.
> And they went over there. And they had to take that long drive all the way down the highway, all the way on the Interstate behind the ambulance, looking through – as you heard Mr. Zimmer say – looking through – hopefully, praying to God that maybe he'll make it. All the way to Charity.

---

[18]See Federal rec., doc. 1, petitioner's supporting memorandum at p. 7.

But, unfortunately, because of this man here, he didn't have that chance, because, you heard from the doctor the first day, Craigie Zimmer died in about a minute.  Died in about a minute.

So, that phone call, unfortunately, came true for them....  That phone call came true for them.  And they've had to live with that every day, every night.[19]

and further

Not only have the Zimmers had to have done the worst thing that any parents have to do, and that's bury a child – I don't know this, but that's what I hear from other people – that there's nothing worse in life than to having [sic] to bury one of your children.  So, they had to go through the ordeal already, they did that.  No more Christmases, no more graduations, no grandchildren from him, none of that.[20]

There is always an element of strategy involved in counsel's decision whether or not to lodge an objection at any given time.  Defense counsel had the opportunity to address the jury immediately following the State's closing remarks.  Great latitude was given to Mahler's attorney who, indeed, employed inflammatory rhetoric of his own in describing the victim.[21]  Counsel is not ineffective for strategically deciding not to object.

Petitioner also claims that counsel was ineffective as a result of his alleged misrepresentations during his opening remarks.  According to petitioner, counsel twice misrepresented that petitioner,

---

[19]See State rec., vol. 3 of 10, trial transcript at p. 20, lines 15-32 and p. 21, lines 1-20.

[20]See State rec., vol. 3 of 10, trial transcript at p. 29, lines 9-18.

[21]See State rec., vol. 3 of 10, trial transcript at p. 41, lines 25-30 where the victim is described as "a punk", "a fighter" and as having "a Confederate flag on his behind".

12

shortly before firing his gun, announced that "there was going to be a shooting", thereby making "petitioner look like the aggressor" and "undermin[ing] petitioner's defense of self-defense and the defense of others."[22]

A review of the trial transcript reflects that counsel's first alleged misstatement was made in the following context:

> [The camp] is at the end of a point of land surrounded on three sides by water.  There is only one way in and one way out through this road that you have seen pictures of. There is no – they are at the end of the road.  There is no place to go.  They are literally captives and when this group of 15 or so young men came down this road and confronted them on their property, threatening to kill Nicholas ....  They took a defensive stance.   David Mahler went to his automobile, got his weapon.  He had a .25, you have seen it, this little .25 caliber weapon, held it up where he says, "Mr. Craig, not many people could see it, I don't think."  But he said, **"Y'all get out of here.  Leave here now.  There is not going to be any fighting.  If there is going to be fighting, there is going to be shooting.  Now, leave this property now."**  [Emphasis added.][23]

Counsel's second misstatement was made in connection with his explanation as to how the disturbance commenced during the fishing rodeo, then carried over to the Mahler's camp.

> Everybody at this rodeo had been drinking, including the police officers.   When this fight broke out, they didn't really try to break up the fight.   They went in there and selectively hit people that they wanted to hit, the trouble makers, the people that were actually fighting. After this fight is when Craig – excuse me, when Nicholas, 17 years old, 5'6", 160 pounds, goes up and punches Craig

---

[22]See Federal rec., doc. 1, petitioner's supporting memorandum at p. 7.

[23]See State rec., vol. 5 of 10, trial transcript at p. 345, lines 27-32 and p. 346, lines 1-15.

Zimmer.   Right after that, immediately after that the evidence will show David Mahler and his girl friend who had just arrived on the scene saw Nicholas Mahler being held by a friend; went over and said, "What's going on here?"  And the – and Nicholas said, "It's not a problem, he's a friend."  And the friend says, "I am holding him because he wants to fight."   David grabs Nicholas by the shirt and takes him home, walks across the bridge.  "Come on, we are getting out of here."   Nicholas fighting all the way, struggling   against his uncle, going, "But my boat, my boat."  David Mahler...said,..."We are going home.  We're getting you away from this.  **We don't want fights**.   And takes him home, walks him to the end of that road, some 600 feet to the end of that road across the highway and waits there for things to die down.  David saw the police were breaking things up and that the rodeo was over.   They waited until almost 12:45, almost an hour after they left, they waited for things to die down.

David then decides with his brother, who he had to wake up because his brother was asleep in bed with his wife when they brought Nicholas back, David then decides, "Let's go back and get the boat."   That's why they were in the truck when all of these people arrived.   David is getting ready to go back across to the rodeo, to the location of the rodeo to get Nicholas' boat with Nicholas.  David said, "I may have had one beer while I was waiting for that hour, while we were sitting up there.   I don't recall if I had a beer.  I may have had a beer.  It's not something I really thought about, but prior to that I had had nothing to drink all day."

David then goes down and gets in the truck with his nephew and with his brother, and they are preparing to leave to go back over to the rodeo to get Nicholas' boat when all of a sudden three truckloads of young men and women come barreling down this dark road in the middle of the night, jumping out of the truck, screaming things.  "We want Nicholas.   We want to kill Nicholas.   Where is Nicholas.  We want to fight Nicholas.  We want him."  What does David do?  Goes to the back of his car, goes in his trunk, gets a gun.  It's a little handgun.  Comes out with it because that's the only defense they had, cocked it and said,  **"Stop right now, there is not going to be any fighting here.  This is private property.  Get out of here now or there is going to be shooting."**  [Emphasis added.][24]

---

[24]<u>See</u> State rec., vol. 5 of 10, trial transcript at p. 347, lines 2-32 and p. 348, lines 1-15.

14

The Court notes that the theory of Mahler's presentation to the jury was that he had a Second Amendment right to bear arms and to defend himself under the circumstances set forth by him and his witnesses.  Defendant contended that a mob approached the camp where he and his family were staying, threatening family members with an ice pick and with bodily harm.  The above statements are not inconsistent with the theory of the case proffered at trial, i.e., "[t]his case is about someone's right to be safe in their home, to bear arms, to protect their home and their family from intruders."[25]  Clearly, when the alleged misstatements are read in context, rather than making petitioner look like the aggressor, defense counsel makes petitioner look like an frightened individual, desperately trying to avoid the breakout of a fight between a bunch of drunken, hot-headed teenagers. The court finds that petitioner was not prejudiced as a result of counsel's alleged misstatements.

Finally, petitioner claims that counsel was ineffective in failing to object, in connection with the trial court's explanation of manslaughter in a situation where there is no specific intent to kill, to the following illustration:

> A classic example, purely by way of illustration, [is] a person firing a gun at the New Year's Eve Party, when there are thousands of people out in the streets with them, and the bullet comes back down and strikes someone.  That

---

[25]See State rec., vol. 3 of 10, trial transcript at p. 33, lines 23-26.

> would be an example of a manslaughter, if there was clearly
> no evidence that you intended to kill or inflict great
> bodily harm upon that person, but someone was shot and
> died.[26]

According to petitioner, counsel's failure to object to the above "inappropriate and one-sided example of manslaughter", improperly "focused the jury's attention on the firing of a gun and a resulting death even though such an example was far more simplistic than the parties' respective theories of the case."[27]

A review of the pertinent transcript reflects that following the trial court's instructions to jurors after both the State and the defense had rested, the jury requested that they be provided with an additional explanation regarding the three possible verdicts they could render.  In response, the court explained:

> The law says that there are three possible verdicts
> that you may return – and this is the only thing you are
> asking me about at this time.  If you have any additional
> questions about what I am going to tell you, let me know,
> and then if you have any questions on any other issue, let
> me know.
> The law says that you may consider the verdict of
> guilty, which is guilty as charged, guilty of second-degree
> murder, guilty of manslaughter and not guilty.[28]

Thereafter, the court provided jurors first with an explanation as to what constitutes second-degree murder and then what constitutes

---

[26]See State rec., vol. 8 of 10, Exhibit Q, Transcript of "Further Instructions" at p. 18, lines 11-17.

[27]See Federal rec., doc. 1, petitioner's supporting memorandum at p. 8.

[28]See State rec., vol. 8 of 10, Exhibit Q, Transcript of "Further Instructions" at p. 14, lines 25-32.

manslaughter, explaining that "[m]anslaughter may be committed under

two ... distinct and separate theories."  The court elaborated:

> The first theory is just like second-degree murder.  It  is
> indeed a second-degree murder in that it is a killing that
> is intentional.  The killing is with the specific intent to
> kill or inflict great bodily harm, but the killing is the
> result of provocation sufficient to deprive  an average
> person of their self-control and their cool reflection,
> provided that a killing will not be reduced from man – from
> second-degree murder to manslaughter, even though there is
> that sufficient provocation, if it is determined that the
> offender's blood had cooled or that a reasonable person's
> blood would have cooled at the time of the killing.  In
> other words, a manslaughter under that theory is a – an
> intentional killing with sufficient provocation to deprive
> an average person of his self-control and cool reflection
> with a further determination that the offender's blood had
> not cooled and that the average person's blood would not
> have cooled at the time of the killing.  If that is the
> situation, the crime is manslaughter.
>     The other theory under which a manslaughter may be
> committed is where there is absolutely no intent to kill or
> inflict great bodily harm upon anyone, including the
> victim, but the person, the accused is in a state where he
> has committed a particular felony, such as the illegal
> discharge of a firearm.  If a person illegally discharges
> a firearm under circumstances where it's reasonably
> foreseeable that human life might be in danger, and they do
> so either intentionally or through criminal negligence,
> with no intent to kill or inflict great bodily harm, if
> someone dies as a result of their having fired that weapon,
> they are guilty of manslaughter.  Again, it would either
> involve their specifically intending to – to fire the gun
> but with no intent to kill or inflict great bodily harm, or
> if they negligently discharged a firearm and the negligence
> was criminal in nature, that is it involved a total and
> wanton disrespect for the interest of others under like
> circumstances.[29]

It was immediately following the above-explanation regarding the

"other theory under which a manslaughter may be committed" that the

---

[29] _See_ State rec., vol. 8 of 10, Exhibit Q, "Further Instructions"
transcript at p. 17, lines 9-32 and p. 18, lines 1-10.

trial court provided jurors with the allegedly objectionable illustration.  However, when the illustration is properly read in the context of the court's detailed explanation regarding the two "distinct and separate theories" of manslaughter, it is clear that petitioner was not prejudiced as a result of the court having provided an illustration in connection with one of the manslaughter "theories", but not in connection with the other.  Judge Waldron, in rejecting the instant claim in connection with petitioner's post-conviction application, stated:  "I don't find in any way that [the pertinent illustration] influenced the [j]ury."[30]  This court agrees.

### Claim 2):  Failure to Provide Exculpatory Evidence

Petitioner contends that the prosecution unconstitutionally failed to provide the defense with evidence which supported his claim that he shot the victim in self-defense and which could have been used to impeach the trial testimony of several prosecution witnesses. Petitioner first points to pre-trial statements taken from prosecution witnesses Brett Schurr, Mark Schurr, and T.J. Willis, which were not provided to the defense.  In their pre-trial statements, these witnesses indicated that the victim was either wrestling with Christopher Mahler over the shotgun or attempting to get to Nicholas Mahler who was standing behind his father, Christopher Mahler, when

---

[30]See State rec., vol. 8 of 10, Exhibit O, April 20, 2004 post-conviction hearing transcript at p. 22, lines 11-12.

petitioner shot him.[31]   At trial, however, they stated that the victim's interaction with Christopher Mahler, whether for the purpose of wrestling over the shotgun or attempting to get to Nicholas Mahler who was hiding behind his father, had ended and the victim was in the process of turning away when petitioner shot him.[32]

Petitioner also considers significant the fact that in several pre-trial statements witnesses described the scene shortly before the shooting in volatile terms, stating that people were arguing, that they wanted to fight, and that access out of the area was blocked. However, in their trial testimony, they "downplayed the hostile atmosphere", stating that the two sides were "talking" with one prior to the shooting.[33]

Petitioner next directs the court's attention to pre-trial statements from Jason Martin, T.J. Willis, and Matt Parsons which

───────────────

[31]See State rec., vol. 10 of 10, Brett Shurr's statement is labeled Exhibit V, Mark Shurr's statement is Exhibit W, and T.J. Willis's statement is Exhibit X.  Petitioner also claims that in a pre-trial statement James Amato, who did not offer testimony at trial, indicated that the victim and Christopher Mahler were struggling for the gun when the shot was fired.  However, a review of Amato's statement, contained in the State rec., vol. 10 of 10, Exhibit Y, reflects that Amato did not actually witness the shooting.  Amato explained that he did not see what happened because, at the time, he was at the rear of the victim's truck and a "big tree" blocked his view.

[32]See State rec., vol. 4 of 10, T.J. Willis's testimony at p. 146, lines 2-4; Brett Schurr's testimony at p. 165, lines 12-14; and Mark Schurr's testimony at p. 258, lines 17-21.

[33]See Federal rec., doc. 1, petitioner's supporting memorandum at p. 13.

reflect their mistaken belief that the shotgun which Christopher Mahler had in his possession was fired. While petitioner admits that whether or not the shotgun was or was not fired is not a crucial point since there is no question that the fatal shot came from David Mahler's handgun, he nevertheless claims that withholding this information was unconstitutional as it could have been used at trial to impeach "the veracity of their perceptions."[34]

Finally, petitioner claims that the prosecution's failure to produce a supplemental police report constituted a violation of his right to due process.[35] Petitioner bases this claim on the fact that, as reflected in the supplemental report, neither Jason Martin nor Chad Nichols, in reporting what they saw to New Orleans Police Detectives Daniel Wharton and Beverly Gunter, stated that prior to being shot the victim had turned away from the scene. However, at trial, Chad Nichols testified that the victim was "turning away" when he was shot.[36] Similarly, Jason Martin stated that the victim had "turned his back to get away" when the gun was fired.[37]

---

[34]The court notes that the pre-trial statement of Matt Parsons could not, in fact, have been utilized for impeachment purposes as Parsons provided no testimony at trial.

[35]A copy of the supplemental police report is contained in the State rec, vol. 10 of 10, Exhibit U.

[36]See State rec., vol. 4 of 10, trial transcript at p. 104, lines 3-6.

[37]See State rec., vol. 5 of 10, trial transcript at p. 298, lines 16-18.

A federal habeas court may grant a writ of habeas corpus on a mixed question of law and fact, such as whether or not evidence was unconstitutionally suppressed, see Trevino v. Johnson, 168 F.3d 173, 184 (5th Cir.), cert. denied, 527 U.S. 1056, 120 S.Ct. 22, 144 L.Ed.2d 825 (1999), only if it determines that the state court decision rested on an "unreasonable application" of clearly established federal law, as determined by the Supreme Court, to the facts of the case. 28 U.S.C. §2254 (d)(1).  The clearly established law in this area was enunciated by the Supreme Court in Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963).   Under Brady and its progeny, "[t]he prosecution's suppression of evidence favorable to the accused violates the Due Process Clause if the evidence is material either to guilt or to punishment." Kopycinski v. Scott, 64 F.3d 223, 225 (5th Cir. 1995), citing Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963).  The prosecution is required to disclose to the defense both exculpatory evidence and evidence that would be useful for impeachment.  Brady, 373 U.S. at 87, 83 S.Ct. at 1196; Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); United States v. Bagley, 473 U.S. 667, 675-76, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985).  Thus, to prove a constitutional violation as contemplated under Brady, there must be a suppression of evidence which is both favorable to the accused and material to his or her guilt or punishment.

Of the above three components, materiality is generally the most difficult to show. With that in mind, the Supreme Court has offered the following guidance. First, the Court has made clear that "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 1565-66, 131 L.Ed.2d 490 (1995) (citation omitted). Materiality is established "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Strickler v. Greene, 527 U.S. 263, 280, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999) (quotation and citation omitted). The Court explained:

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial.

Kyles, 514 U.S. at 434, 115 S.Ct. at 1566 (quotation omitted).

Immediately following the second of two post-conviction hearings, after listening to witnesses' testimony, along with counsel's arguments, the trial court summarized the basis of petitioner's Brady claim as follows: "[I]n the pretrial preliminary statements given by certain witnesses to the police, the word 'struggle'" was used to describe what they saw, but this same word

was not employed at trial.  Thus, the court reasoned: "The question becomes is the failure to present a statement wherein initially someone described what they allegedly perceived as being a struggle, and yet failed to use that word in describing what they allegedly observed before the [j]ury, a violation of <u>Brady</u> and the cases that follow ..."?  The court resolved this question in the negative based upon its factual finding that "what was offered at trial clearly gave the [j]ury a sense that there was indeed a struggle."  The court elaborated: "[T]he [j]ury left the room here at the end of this proceeding clearly understanding that a group of young men found themselves continuing what originally was a minor misunderstanding, a minor offensive action, perhaps, in the eyes of some of the parties, that carried over."[38]

Under the provisions of 28 U.S.C. §2254 (e)(1), this court may presume the correctness of the state trial court's factual finding that the testimony offered at trial left the unmistakable notion that a struggle had preceded the fatal shooting.  Accordingly, the suppressed pre-trial statements which reflected that a struggle took place, can properly be categorized as cumulative evidence, rather than material evidence.  Also supporting a finding that the suppressed evidence was not material is the testimony of Dr. Richard Tracey, a pathologist, who informed, based upon the autopsy he

---

[38]<u>See</u> State rec., vol. 8 of 10, April 20, 2004 post-conviction hearing transcript at p. 21, lines 23-32 and p. 22, lines 1-7.

performed on the victim, that the victim "was shot once in the back."[39]   Thus, regardless of exactly when a struggle took place in proximity to when the shooting occurred, it is clear that at some point prior to the shooting the victim had, in fact, turned away from the shooter.   Accordingly, the court finds that the suppression of the evidence at issue does not represent a violation of petitioner's right to due process.

**Claim 3):  Insufficient Evidence**

Petitioner claims that there was insufficient evidence to support his manslaughter conviction.  The basis of petitioner's claim is his contention that the State failed to show that he was not acting in self defense when he shot the victim.

As set forth above, a federal court may grant habeas relief only if it determines that the state court decision rested on an "unreasonable application" of clearly established federal law, as determined by the Supreme Court, to the facts of the case.  See 28 U.S.C. §2254(d)(1).  In its analysis of petitioner's insufficiency of evidence claim, the Louisiana Fourth Circuit Court of Appeal first set forth the applicable Supreme Court law and how it relates to corresponding Louisiana law, stating:

> The standard for reviewing a claim of insufficient evidence is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the

[39]See State rec., vol. 4 of 10, trial transcript at p. 65, line 27.

offense proven beyond a reasonable doubt.  <u>Jackson v. Virginia</u>, 443 U.S. 307, 99 S.Ct. 2781 (1979).  The reviewing court is to consider the record as a whole and not just the evidence most favorable to the prosecution; and if rational triers of fact could disagree as to the interpretation of the evidence, the rational decision to convict should be upheld.  <u>State v. Mussall</u>, 523 So.2d 1305 (La. 1988).  Additionally, the court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.  <u>Id</u>.  The trier of fact's determination of credibility is not to be disturbed on appeal absent an abuse of discretion.  <u>State v. Cashen</u>, 544 So.2d 1268 (La. App. 4 Cir. 1989).

The state appellate court then examined the applicable state statutes and corresponding case law.

The defendant was indicted for second-degree murder; however, the jury convicted him of manslaughter.  La.R.S. 14:31 defines manslaughter, in pertinent part, as:

> (1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection.  Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed;...

"Sudden passion" and "heat of blood" are not separate elements of the offense but are mitigating factors, which reduce the offense from second degree murder to manslaughter.  <u>State v. Lombard</u>, 486 So.2d 106 (La. 1986).  Since they are mitigating factors, the defendant must prove by a preponderance of the evidence that he acted in "sudden passion" or "heat of blood."  <u>Id</u>.  These factors do not have to be proven affirmatively but may be inferred by the jury from the circumstances of the crime.  <u>State v. Tompkins</u>, 403 So.2d 644 (La. 1981).  La.R.S. 14:20(1) provides that a homicide is justifiable:

> When committed in self-defense by one who

reasonably believes that he is in imminent
danger of losing his life or receiving great
bodily harm and that the killing is necessary to
save himself from that danger.

Once a defendant raises the issue of self-defense, the
State then has the burden of establishing beyond a
reasonable doubt that the defendant did not act in self-
defense.  State v. Tassin, 536 So.2d 402 (La. 1988), cert.
den., 493 U.S. 874, 110 S.Ct. 205 (1989), reh. den., 495
U.S. 924, 110 S.Ct. 1961 (1990).
There is no issue as to whether the defendant killed
the victim.  The only question is whether the defendant
acted with justification.  In considering a self-defense
claim, it is necessary to consider whether the defendant
had a reasonable belief that he was in imminent danger of
losing his life or receiving great bodily harm and that
the killing was necessary to save himself from that danger.
State v. Bailey, 261 La. 831, 261 So.2d 583 (1972).
Although there is no unqualified duty to retreat, the
possibility of escape is a factor in determining whether
or not a defendant had the reasonable belief that deadly
force was necessary to avoid the danger.  State v. Brown,
414 So.2d 726 (La. 1982).

Thereafter, the state appellate court, utilizing the standard

enunciated in Jackson, supra, reviewed the pertinent evidence.

The record plainly shows that the defendant could have
avoided the danger by retreating to the safety of the
house, as he directed other family members to do.  The
defendant chose to escalate tensions by arming himself and
directing his brother to do the same.  Although there was
some testimony that certain members of the crowd were
wielding sticks, by all accounts the victim was unarmed.
However, perhaps the most compelling evidence negating the
defendant's claim of self-defense came from Dr. Tracey, an
expert in forensic pathology, who performed the autopsy on
the victim's body, and testified that the victim was shot
in the back.  This refutes the defendant's claim that the
victim was threatening him and/or his brother at the time
the defendant fired the fatal shot.  Moreover, witnesses
testified that the victim was walking away from the
confrontation when the defendant shot him.

Based upon the above, it is clear that the state court properly

examined the burden upon the State to prove manslaughter and to prove that petitioner did not act in self-defense, and determined, examining the evidence in a light most favorable to the prosecution, that the State had met its burden.  Accordingly, the court finds that the Louisiana Fourth Circuit Court of Appeal did not unreasonably apply the applicable law enunciated by the Supreme Court in <u>Jackson</u>, <u>supra</u>.  Furthermore, the court agrees with the findings of the state court on this issue.

**Claim 4):  Trial Court Erred in Denying Defense Request that Jury View the Crime Scene**

Petitioner claims that the trial court erred in denying defense counsel's motions, submitted prior to and during trial, that the jury be transported to the scene of the incident "in order that the jury could fully appreciate the physical setting petitioner found himself in when he had to make the decision to fire the pistol."[40]  In support of his claim, petitioner cites only state law which provides that it is within a trial court's discretion to allow a jury "to view the place where the crime or any material part thereof is alleged to have occurred...."  La.C.Cr.P. art. 762(2).

In addressing petitioner's claim on habeas review, the matter to be resolved is not whether the trial court's denial of defense counsel's motions was violative of state law, but rather, whether it rendered the petitioner's trial fundamentally unfair so as to deny

---

[40]<u>See</u> Federal rec., doc. 1, petitioner's supporting memorandum at p. 18.

him due process.  Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991); see also Corpus v. Estelle, 571 F.2d 1378, 1381 (5th Cir.), cert. denied, 439 U.S. 957, 99 S.Ct. 359, 58 L.Ed.2d 350 (1978), citing Hills v. Henderson, 529 F.2d 397, 401 (5th Cir.), cert. denied, 429 U.S. 850, 97 S.Ct. 139, 50 L.Ed.2d 124 (1976).  On direct appeal, the state appellate court, after recognizing a trial court's authority to allow a jury to view the crime scene, ultimately concluded that the trial court, in this instance, did not err in denying defense counsel's motions.  The court's conclusion was based upon the following factual findings:

> In this case, the defense produced a videotape made by its investigators, at the same time of night that the shooting occurred.  The tape slowly and methodically captured the distance of the Mahler camp from the highway, the condition of the shell road leading up to the camp, the marsh and water surrounding the camp on three sides and the camp's distance from neighboring houses. Additionally, the State and defense produced numerous photographs which were identified by many of the witnesses as depicting the Mahler camp and its environs.  Moreover, the defense sufficiently emphasized the geographical layout of the property and its remoteness through its witnesses' testimony.   The photographs coupled with the videotape adequately depicted the crime scene for the jury.

Presuming the above factual findings on the part of the state appellate court to be correct, see 28 U.S.C. §2254(e)(1), clearly petitioner's trial, by virtue of the trial court's denial of defense counsel's motions to allow the jury to view the actual crime scene, was not rendered fundamentally unfair so as to deny him due process. Accordingly, petitioner is not entitled to habeas corpus relief.

**Claim 5):  Excessive Sentence**

Petitioner contends that the 20-year sentence which he is presently serving in connection with his manslaughter conviction is unconstitutionally excessive. While petitioner acknowledges that he did not receive the maximum possible sentence of 40 years incarceration, he nevertheless argues that the imposed sentence of one-half the maximum is excessive in light of the fact that he had no prior felony convictions and only one prior misdemeanor conviction for carrying, approximately 15 years earlier, a concealed pocket knife. Other factors which, according to petitioner, militate against a 20-year sentence, are: 1) His gainful employment, prior to this incident, for seven years as a fireman with the New Orleans Fire Department; 2) his close ties with his children; 3) the high degree of tension he was experiencing, at the time of the shooting, in light of the fact that he was surrounded by hostile people with no means of escape; and, 4) his instruction to his sister-in-law, Cathy Mahler, prior to the shooting, to "call 911".[41]

Petitioner further points to the conflicting views, with respect to an appropriate sentence, of the two families involved in the incident. The victim's family wanted the maximum 40-year sentence imposed, while the petitioner's family felt the homicide was justified and no prison term was warranted. As a result, petitioner suggests that the trial court, rather than properly considering the

---

[41]See Federal rec., doc. 1, petitioner's supporting memorandum at pp. 20-21.

matter, simply "'split the difference' by sentencing [him] to 20 years at hard labor."[42]

Federal courts accord wide discretion to a state trial court's sentencing decision. Generally, if a sentence is within the statutory limits, a federal habeas court will not upset the terms of that sentence unless it is so disproportionate to the offense as to be completely arbitrary and shocking. Bonner v. Henderson, 517 F.2d 135, 136 (5th Cir. 1975); see also Smallwood v. Johnson, 73 F.3d 1343, 1347 (5th Cir. 1996), cert. denied, 519 U.S. 883, 117 S.Ct. 212, 136 L.Ed. 2d 146 (1996) (emphasizing that a federal court will not review a state sentencing without a threshold showing that the sentence is "grossly disproportionate to the offense.")

In this case, petitioner was sentenced in accordance with applicable statutory provisions. Specifically, he was sentenced in accordance with LSA-R.S. 14:31.B. which provides, in pertinent part: "Whoever commits manslaughter shall be imprisoned at hard labor for not more than forty years." Further, as reflected below, the trial court, contrary to petitioner's suggestion, did give careful consideration with respect to what would constitute an appropriate sentence under the facts of this case.

First, Orleans Parish Criminal District Court Judge Dennis Waldron specifically recognized the conflicting views of the two

---

[42]See Federal rec., doc. 1, petitioner's supporting memorandum at pp. 20-21.

families, the Mahlers and the Zimmers, candidly stating:  "The
defendant's family is in favor of leniency.  The victim's family is
in favor of the maximum sentence."[43]  Judge Waldron then made clear
that he does not, by rote, sentence someone to a set number of years
for a particular crime, explaining:  "[T]his court doesn't just sit
here with a closed mind and say, 'Well, we'll automatically give this
sentence in the manslaughter cases.'  Each case has to be looked at
individually."[44]  The trial judge then set forth what he "looked at"
or considered, in this individual case.

With respect to factors warranting leniency, Judge Waldron first
took into account the jury's verdict, noting:  "The [j]ury saw fit
in this case to return a lesser verdict.  They found that this
killing indeed involved a crime but not the crime of murder."[45]  Then,
the court took into account the fact that alcohol was involved,
observing:

> Alcohol and guns never mix.  Did the defendant only
> have the one beer, if memory serves me correct, he said
> after he came from the grocery that he drank?  I'm not here
> to say that he didn't.  Were some of the young men, I don't
> necessarily mean Craig Zimmer, were some of the men
> drinking and drinking to excess?  Perhaps so.  Should they
> have gone to the Mahler home that night?  Some of you may
> be in the room here today.  I don't necessarily recognize
> or remember you by face.  But I think it goes without

---

[43]See State rec., vol. 4 of 10, sentencing hearing transcript at
p. 92, lines 16-18.

[44]See State rec., vol. 4 of 10, sentencing hearing transcript at
p. 92, lines 23-26.

[45]See State rec., vol. 4 of 10, p. 92, lines 29-31.

> saying that every person, if they could turn back the
> clock, if we could go back to that Labor Day weekend a year
> ago, you'd have been some place other than at the Mahler
> home.  Am I saying you have blood on your hands or that
> you're responsible?  Absolutely not.  But I'm only saying
> that perhaps people shouldn't have gone where they went.
> Does that justify what Mr. Mahler did?  Absolutely not.
> Is it something to consider in mitigation?  The [j]ury
> thought so, apparently, with the verdict that was
> returned....[46]

Judge Waldron next considered factors militating against leniency.  He first noted that the victim was unarmed at the time of the shooting.  Thereafter, the judge found particularly significant the fact that the victim was shot in the back, stating: "The defendant shot this man in the back.  That's what won't leave my mind.  I cannot get that out of my mind.  He was shot in the back."[47]

Considering the above conflicting factors, Judge Waldron ultimately sentenced petitioner to "twenty years in the custody of the Department of Corrections."  Further, the court noted that, at a minimum, petitioner would have to serve "eighty five percent" of his 20-year sentence, meaning "he would be released at approximately 57 years of age."[48]

Based upon the thoughtful reasoning set forth by Judge Waldron during petitioner's October 13, 1998 sentencing hearing, it is clear

---

[46]See State rec., vol. 4 of 10, p. 93, lines 11-26.

[47]See State rec., vol. 4 of 10, sentencing hearing transcript at p. 94, lines 21-23.

[48]See State rec., vol. 4 of 10, sentencing hearing transcript at p. 96, lines 5-11.

that the 20-year sentence imposed upon petitioner is, in fact, proportionate to the particular facts of petitioner's offense. Accordingly, petitioner's claim that he received an unconstitutionally excessive sentence is without merit.

**Claim 6): Conviction Violative of the United States Constitution Because Method Employed to Select Grand Jury Foreperson Systematically Excluded African Americans**

As stated earlier, petitioner, on August 31, 1997, was indicted by an Orleans Parish Grand Jury on the charge of second-degree murder. As a result of that indictment, petitioner was brought to trial and ultimately convicted on the lesser charge of manslaughter. Petitioner challenges the validity of his conviction based upon the claim that the prescribed method for selecting the foreperson for the grand jury which indicted him was violative of his right to equal protection, guaranteed under the Constitution of the United States, due to its systematic exclusion of African-Americans.

A review of petitioner's state court pleadings reflects that petitioner raised the instant claim in connection with his post-conviction application. As noted above, the state district court was the only state court to address the merits of petitioner's post-conviction application.[49] A review of the state district court's ruling reflects that while the court purported to address petitioner's claim that the selection method was violative of his constitutional right to equal protection, in actuality, the court

---

[49] See discussion *supra* at pp. 2-3.

addressed petitioner's claim that the selection process was violative of the Louisiana Constitution.

Judge Waldron, rather than issuing a written opinion, issued his post-conviction decision from the bench in open court following an April 20, 2004 post-conviction hearing.  A review of the pertinent portion of the transcript reflects that in purportedly addressing and rejecting the instant claim, the state district court relied solely upon the Louisiana Fourth Circuit Court of Appeal's decision in <u>State v. Williams</u>, 866 So.2d 296 (La. App. 4 Cir. 2004).  Specifically, Judge Waldron reasoned:

> [W]e all are aware of the most recent opinion handed down, and I believe reported in last week's Southern Second advance sheet, <u>State versus Glenn Williams</u>, 866 So.2d 296.  There the [c]ourt upheld a conviction for a crime that was prosecuted as a result of a Grand Jury indictment here in Orleans Parish, under the then existing laws relative to the distinction that was made for Orleans Parish as to how the foreperson of the Grand Jury was selected, and how all members of the Grand Jury were ultimately selected from the venire that was established by law exclusively at the time for Orleans Parish.
>      In the Louisiana Fourth Circuit Court of Appeal, His Honor Judge Edwin Lombard, the author of the opinion finding that the conviction should be upheld as there was no substantial right of the defendant that in anyway that was affected or violated.  I find that the same rule applies here....[50]

A review of <u>Williams</u>, <u>supra</u>, however, reflects that the issue before the <u>Williams</u> court was not a challenge to the pertinent selection process because it was violative of petitioner's right to

---

[50]<u>See</u> State rec., vol. 8 of 10, April 20, 2004 post-conviction hearing transcript at p. 18, lines 10-26.

equal protection because it systematically excluded African-Americans. Instead, the <u>Williams</u> petitioner's challenge was based upon the claim that the grand jury selection process was violative of Article III, Section 12(A)(3) of the Louisiana Constitution because it constituted a local law concerning criminal actions.[51]  The <u>Williams</u> court rejected petitioner's challenge, reasoning:

> [T]he constitutional prohibition against local laws ... simply reflects a policy decision that legislative resources and attention should be concentrated upon matters of general interest and that purely local matters should be left to local governing authorities. <u>Morial v. Smith & Wesson Corp.</u>, 2000-1132, p. 22 (La.App. 4 Cir. 4/3/01), 785 So.2d 1, 17; <u>Kimball v. Allstate Ins., Co.</u>, 97-2885, p. 4 (La.4/14/98), 712 So.2d 46, 50. As such, the substantial rights of a criminal defendant are not affected <u>per</u> <u>se</u> solely because he is indicted by a grand jury selected pursuant to local laws passed by the Louisiana State legislature. Thus, although the trial court erred in denying defendant's motion to quash his grand jury indictment based on the unconstitutionality of the local laws at issue, there is no showing that the error affected his substantial rights. Accordingly, the error does not require reversal of defendant's conviction, sentence and indictment....

<u>Id</u>. at 298-299 (footnote omitted).[52]

---

[51]La. Const. Art. III, Section 12.(A)(3) prohibits the Louisiana Legislature from passing a local law "[c]oncerning any civil or criminal actions...."

[52]The <u>Williams</u> court specifically distinguished the grand jury challenge presently before it with the grand jury challenge at issue in <u>Rideau v. Whitley</u>, 237 F.3d 472 (5th Cir. 2000), <u>cert. denied</u>, 533 U.S. 924, 121 S.Ct. 2539, 150 L.Ed.2d 708 (2001), wherein the petitioner's challenge was based on the allegation "that there had been a systemic exclusion of black jurors from the Calcasieu Parish grand jury that returned his indictment for first degree murder." <u>Williams</u>, 866 So.2d at 298 n.5.

Generally, when a petitioner raises a claim in his federal habeas corpus petition that has not been addressed by either the highest state court or the highest state court to issue a reasoned opinion, said petitioner is deemed to have failed to exhaust his state court remedies and the matter must be dismissed without prejudice.  <u>See</u> <u>generally</u> 28 U.S.C. §2254; <u>Rose v. Lundy</u>, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982).  However, such a dismissal is not required in a situation such as this, where the issue was, in fact, raised in the state court system, but was not addressed by the pertinent state courts.  <u>See</u> <u>Houston v. Estelle</u> 569 F.2d 372, 375 (5th Cir. 1978) (quotation omitted) ("[W]hether the exhaustion requirement of 28 U.S.C. §2254(b) has been satisfied cannot turn upon whether a state appellate court chooses to ignore in its opinion a federal constitutional claim squarely raised in the petitioner's brief in the same court....")  Accordingly, this court shall proceed to address the merits.

In <u>Deloch v. Whitley</u>, 684 So.2d 349 (La. 1996), the Louisiana Supreme Court held that a defendant's failure to file a pre-trial motion to quash waives his equal protection claim arising out of the allegedly discriminatory selection of the grand jury foreperson.  Following <u>Deloch</u>, the Fifth Circuit has similarly held that "[i]t is undisputable that under Louisiana law, a challenge to the legality of the grand jury venire must be made by a pretrial motion to quash", absent which the claim is procedurally barred. <u>Williams v. Cain</u>, 125

F.3d 269, 274 (5th Cir. 1997), <u>cert</u>. <u>denied</u>, 525 U.S. 859, 119 S.Ct. 144, 142 L.Ed.2d 116 (1998).   As Mahler did not file a pre-trial motion to quash, the court finds that he is currently barred from asserting the instant claim.

Having failed to comply with the state's procedural rule as to when his claim may be asserted, Mahler must show that he was prejudiced in some fashion in order to obtain further consideration of the issue.  <u>Pickney v. Cain</u>, 337 F.3d 542, 545-46 (5th Cir. 2003). This, petitioner has not done.  He has not suggested any reason for the court to believe that he would not have been indicted, even had the procedure employed been different.   Furthermore, it is obvious that, even if he had succeeded in having the initial indictment quashed through a timely filed motion, the State would have undoubtedly sought and obtained a second indictment against him. <u>Pickney</u>, 337 F.3d at 545; <u>Brown v. Cain</u>, 337 F.3d 546, 550 n.5 (5th Cir. 2003), <u>cert</u>. <u>denied</u>, 540 U.S. 1117, 124 S.Ct. 1065, 157 L.Ed.2d 911(2004).  He has, therefore, demonstrated no prejudice.

Lastly, the court notes that to grant petitioner the relief he seeks would result in a precedent which could invalidate every jury verdict in every criminal case emanating from Orleans Parish over a significant period of time.   This court declines to do so.

**Claim 7) Conviction Violative of Louisiana Constitution Because Statute Prescribing Method of Selecting Grand Jury Violative of**

**Article III, Section 12 of Louisiana Constitution**[53]

Mahler seeks to obtain federal habeas corpus relief based upon the fact that the method employed to choose the members of the grand jury which indicted him was violative of Article III, Section 12(A)(3) of the Louisiana Constitution.  However, it is axiomatic that federal habeas relief may be granted only to remedy violations of the Constitution and laws of the United States; mere violations of state law will not suffice.  28 U.S.C. §2254(a); <u>Engle v. Issac</u>, 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1983); <u>Bailey v. Procunier</u>, 744 F.2d 1166, 1168 (5th Cir. 1984).

**Claim 8):  Unconstitutional Use of "Short Form Indictment"**[54]

Petitioner contends that the use of the "short form" indictment pursuant to La.C.Cr.P. Art. 465 violated his constitutional rights

---

[53]While the instant claim is listed under Mahler's "<u>ISSUES</u>", <u>see</u> Federal rec., doc. 1, petitioner's supporting memorandum at pp. 4-5, he has failed to provide any supporting argument.  Accordingly, this court has looked to the pertinent argument set forth in petitioner's supporting memoranda submitted in connection with his application for state post-conviction relief.  <u>See</u> State rec., vol. 8 of 10 for supporting memorandum containing pertinent argument submitted to state district court and <u>see</u> State rec., vol. 1 of 10, for supporting memoranda containing pertinent arguments submitted to state appellate and state supreme courts.  Additionally, while no state court issued a reasoned ruling with respect to the instant claim, this court, for the reasons set forth <u>supra</u> at pp. 37-38, shall nevertheless address the matter.

[54]As with claims 6) and 7), the instant issue was brought before the state district, appeal and supreme courts in connection with petitioner's state post-conviction application, but none of these courts specifically addressed the issue.  However, as discussed <u>supra</u> at pp. 37-38, this court may nevertheless address the issue.

in that it merely charged that he "committed SECOND DEGREE MURDER of CRAIG ZIMMER", rather than specifying, in accordance with the applicable criminal statute, LSA-R.S. 14:30.1.A.(1), that he committed second degree murder with the "specific intent to kill or to inflict great bodily harm". In support of his argument, petitioner cites Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Jones v. United States, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), arguing that the "continued constitutional vitality of Louisiana's short-form indictments ... has been called into question" by the above-cited cases.[55]

Petitioner's reliance on Ring, supra, and Apprendi, supra, is misplaced as the respective petitioners in those cases did not challenge the constitutionality of their indictments. In Ring, 536 U.S. at 597 n.4, 122 S.Ct. at 2437 n.4, the Court specifically commented: "Ring does not contend that his indictment was constitutionally defective. See Apprendi, 530 U.S., at 477, n.3, 120 S.Ct. 2348 (Fourteenth Amendment 'has not ... been construed to include the Fifth Amendment right to "presentment or indictment of a Grand Jury"')." Petitioner's reliance on Jones, supra, is likewise misplaced. As Judge Schwartz observed in Brown v. Cain, 2001 WL

---

[55]See Federal rec., doc. 1, petitioner's supporting memorandum at p. 26.

96410, *2 (E.D. La. 2001), <u>Jones</u> does not control the disposition of a habeas corpus matter as it was not a §2254 case, but rather, involved an appeal of a federal conviction.  Judge Schwartz further observed the limited federal habeas corpus review afforded to a claim challenging the sufficiency of a state court indictment.

> The sufficiency of a state court indictment is cognizable on federal habeas corpus only if the indictment was so flawed that the state court was deprived of jurisdiction. In other words, if the state courts had jurisdiction under the indictment to hear the case against petitioner, this [c]ourt does <u>not</u> have jurisdiction to consider the sufficiency of that indictment under the law applicable to habeas corpus proceedings.
>
> Additionally, the question of whether the state courts had jurisdiction is one for those courts.  "[J]urisdiction to try an offense includes jurisdiction to determine whether the offense is properly charged."

<u>Brown</u>, 2001 WL at *2, <u>quoting</u> <u>Murphy v. Beto</u>, 416 F.2d 98, 100 (5th Cir. 1969) (emphasis original).[56]

Following the above discussion, the <u>Brown</u> court acknowledged that a federal court, on habeas review, could scrutinize a state court indictment for purposes of determining whether, in accordance

---

[56]Judge Schwartz further noted that the above-described limited federal habeas review is applicable even when the state's highest court has not specifically addressed a petitioner's sufficiency of the indictment claim.  In support, Judge Schwartz cited <u>Alexander v. McCotter</u>, 775 F.2d 595 (5th Cir. 1985), wherein the Fifth Circuit determined that the Texas Court of Criminal Appeals, the "highest criminal court in Texas," "necessarily held that the indictment was sufficient for state jurisdictional purposes" where "the sufficiency of indictment claims were presented" and the state court "refused discretionary review and denied a petition for a state writ of habeas corpus ... without expressly commenting or ruling on the alleged deficiencies...."  <u>Brown</u>, 2001 WL at *2 n.12.

with the Due Process Clause of the Fourteenth Amendment, the petitioner received "fair notice of the charges against him to permit adequate preparation of his defense." Id. at *3 (footnote omitted). A federal court, however, is not limited to an examination of the pertinent indictment for purposes of determining whether or not the requisite notice has been provided. "[T]he accused's constitutional right to notice of the charge brought against him can be satisfied by the availability of other means of obtaining notice ... such as a bill of particulars, a preliminary examination and criminal pre-trial discovery." Dowell v. Lensing, 805 F.Supp. 1335, 1343 (M.D. La. 1992), citing Liner v. Phelps, 731 F.2d 1201 (5th Cir. 1984) (footnote omitted).

In this case, defense counsel filed a "Motion for Bill of Particulars and Discovery and Inspection", demanding that "they [be] furnished with" 33 enumerated particulars.[57] In response thereto, the prosecution submitted "Answers to Motion for Bill of Particulars and Discovery and Inspection" setting forth responses to defense counsel's 33 enumerated particulars.[58] Further, in accordance with criminal pre-trial discovery procedure, the defense was provided with a copy of the incident report, the transcripts of three "911" calls,

---

[57]A copy of the pertinent motion for bill of particulars is contained in the State rec., vol. 2 of 10, pp. 121-123.

[58]A copy of the prosecutions's responses is contained in the State rec., vol. 2 of 10, pp. 91-92.

the coroner's report, and the crime laboratory reports.[59]  Finally, a preliminary hearing was conducted on September 9, 1997, pursuant to which New Orleans Police Detective Daniel Wharton provided, in connection with both the prosecutor's direct examination and defense counsel's cross-examination, extensive testimony regarding his investigative findings as to what transpired at the Mahler residence on the night of the shooting.[60]  Clearly, petitioner had, as required under the Fourteenth Amendment, sufficient notice of the charge lodged against him to facilitate adequate preparation of a defense.

### RECOMMENDATION

It is therefore RECOMMENDED that the petition of David Mahler for habeas corpus relief be DENIED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result

---

[59]Copies of the incident report, "911" transcripts, and coroner's report are contained in the State rec., vol. 2 of 10.  Copies of the crime laboratory reports are contained in the State rec., vol. 6 of 10.

[60]A copy of the 35-page preliminary hearing transcript is contained in the State rec., vol. 8 of 10.

from a failure to object.  <u>Douglass v. United Services Auto. Ass'n</u>,
79 F.3d 1415, 1430 (5th Cir. 1996).

New Orleans, Louisiana, this <u>18th</u> day of <u>      July      </u>, 2006.


<u>ALMA L. CHASEZ</u>
United States Magistrate Judge